## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| BLOOMDALE, S.A. and GOTRA LIMITED | CIVIL NO.: |
| Plaintiffs, | |
| v. | |
| BANCRÉDITO INTERNATIONAL BANK AND TRUST CORPORATION and JULIO HERRERA VELUTINI | RE: BREACH OF CONTRACT, DAMAGES, TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS |
| Defendants. | |

## COMPLAINT

TO THE HONORABLE COURT:

COME NOW BLOOMDALE S.A. and GOTRA LIMITED, through the undersigned attorneys, and respectfully STATE, ALLEGE and PRAY as follows:

### I.    NATURE OF PROCEEDINGS

This is an action for breach of contract, damages, and tortious interference with contractual relations against BANCRÉDITO INTERNATIONAL BANK AND TRUST CORPORATION ("Bancredito") and JULIO HERRERA VELUTINI, owner and President of Bancredito Board of Directors. As further explained below, Bloomdale deposited certain funds with Bancredito in May of 2015 with the stated intention that Bancredito would hold the funds for a short period of time and would return the funds upon request, in exchange for a fee of four percent (4%) of the amount of the funds deposited.

More than four years have elapsed since the funds were deposited and, despite multiple instructions and requests from Bloomdale to Bancredito to disburse and return the funds that are undisputedly the property of Bloomdale, Bancredito has failed to do so. Bancredito has unjustly

enriched itself by holding Bloomdale's funds in violation of the terms and conditions agreed upon by the parties.

Upon information and belief, these actions constitute Bancredito's *modus operandi*: placing unreasonable obstacles and making up excuses to deny its clients access to money that rightfully belongs to them while Bancredito and the President of its Board use their clients' moneys for their own benefit. *See*, *e.g., Capital Union Bank v. Bancredito Int'l Bank Corp.*, Civil No. 17-2273 (FAB), *Choice Bank, LTD v. Bancredito Int'l Bank Corp.*, Civil No. 18-01288 (FAB), and *Ansbacher Ltd. v. Bancredito Int'l Bank*, Civil No. 19-01808 (DRD).

## II.      PARTIES

1.      Plaintiff BLOOMDALE, S.A. ("Bloomdale") is a corporation incorporated in Panama, with its principal place of business located at ADR Building, 13th Floor, Samuel Lewis Avenue and 58th Street, Obarrio, in Panama City, Republic of Panama.

2.      Plaintiff GOTRA LIMITED ("Gotra") is a United Arab Emirates ("UAE") corporation, incorporated in Ras Al Khaima, UAE, under number IC20151378. Gotra's principal place of business is located at Suite 2601, 26th Floor, the H Hotel Tower, One Sheikh Zayed Road, in Dubai, United Arab Emirates.

3.      Jacques Lasry is the beneficial owner of both Bloomdale and Gotra.

4.      Defendant BANCREDITO INTERNATIONAL BANK AND TRUST CORPORATION ("Bancredito") is an International Banking Center created under the laws of the Commonwealth of Puerto Rico and registered in the P.R. Department of State under file no. 59. Bancredito's principal place of business is located at 250 Muñoz Rivera Avenue, 14th Floor, Suite 1410, San Juan, Puerto Rico 00918.

5.      As an International Banking Center, Bancredito is regulated by the Office of the Commissioner of Financial Institutions of Puerto Rico. Its services are directed towards individuals and companies worldwide.

6.      Bancredito has changed its corporate name multiple times. Among its prior corporate names are Bancredito International Bank Corporation, Banvelca International Bank Corp., and Banreal International Banking Corp.

7.      Julio Herrera Velutini is the founder and owner of Bancredito Int'l, as well as the President of its Board of Directors. Upon information and belief, Herrera Velutini is a resident of Puerto Rico and is domiciled in Puerto Rico.

### III.      JURISDICTION AND VENUE

8.      This Court has jurisdiction of this civil action pursuant to 28 U.S.C. §1332 (diversity and alienage jurisdiction).

9.      There is complete diversity of citizenship between the parties as:

a.      Plaintiff Bloomdale is incorporated and has its principal place of business in the Republic of Panama;

b.      Plaintiff Gotra is incorporated and has its principal place of business in the United Arab Emirates;

c.      Defendant Bancredito is incorporated under the laws of the Commonwealth of Puerto Rico and has its principal place of business in Puerto Rico; and,

d.      Upon information and belief, Defendant Herrera Velutini is a resident of Puerto Rico and is domiciled in Puerto Rico.

10.     The amount in controversy exceeds $75,000.00, excluding interest and fees.

11.     Venue is proper in the District of Puerto Rico pursuant to 28 U.S.C. §1391 because Defendants are subject to personal jurisdiction in this district and the facts relevant to the action occurred and continue to take place in Puerto Rico.

### IV.     NATURE OF THE ACTION

12.     This is an action against Bancredito for breach of contract under Articles 1044, 1077, 1206-1210, and 1054 of the Puerto Rico Civil Code, 31 L.P.R.A. §§ 2994, 3052, 3371-3375 and 3018.

13.     Because Bancredito has breached its contractual duties in an intentional and willful manner, the Plaintiffs are entitled to recover any and all damages resulting from said breach, damages which are estimated in an amount no less than $8,000,000 and growing.

14.     This is also an action for tortious interference with contractual relations against Herrera Velutini.

15.     Finally, the Plaintiffs seek attorney's fees against Bancredito and Herrera Velutini.

### V.     FACTS

16.     In May of 2015, Plaintiff Bloomdale held certain funds in a foreign bank when he received concerning information about the financial status that bank, including rumors about a potential insolvency.

17.     As a result of this information, Bloomdale decided to withdraw its funds from that bank as quickly as possible and to transfer the funds temporarily into another banking institution.

18.     Because it was unfamiliar with the legal or regulatory requirements of the banking industry in the United States, Bloomdale contacted Pristine Capital Group to assist it in exploring its options with regard to the transfer of its funds out the foreign bank and into a new bank.

19.     Pristine Capital Group is an independent consulting company which provides financial and banking advice. It advertises that it provides consulting services "through its strategic alliances", including "private banking introductions". Its customized services include "international wire transfers", "private banking" and "short term cash management". Michelle Furnari is the President and CEO of Pristine Capital Group.

20.     Bloomdale informed Pristine Capital that it needed to transfer the funds as soon as possible as it could not wait weeks or months and risk losing its money due to the possible insolvency of the bank which then held the funds. It also informed Pristine Capital that the funds were to be held by the new bank only on a short-term basis and would have to be available upon demand within a very short amount of time.

21.     The funds were to be held only temporarily by the new bank because they were ultimately to be transferred to Gotra, an entity with common ownership. Gotra was in the process of opening a bank account in Dubai and, as soon as the account was open, Bloomdale was to transfer the funds into this account. Bloomdale anticipated that the process of opening the bank account for Gotra in Dubai would take approximately three months.

22.     Furnari contacted Herrera Velutini directly to inquire as to whether Bancredito could provide the services required by Bloomdale. Furnari was familiar with Bancredito and Herrera Velutini as they had conducted business in the past.

23.     Herrera Velutini told Furnari that Bancredito could open an account for Bloomdale immediately, without the need for any formal procedures, and that the deposited funds would be available upon request, in exchange for a fee of four percent (4%) of the value of the funds. Bancredito did not impose any other requirements upon Bloomdale for the transfer and deposit of

the funds. The funds were to be deposited in Bancredito's own account; in other words, Bancredito would not set up a separate account for Bloomdale.

24.     Furnari forwarded this information to Bloomdale, and Bloomdale agreed to the terms described above.

25.     A contract was created between Bloomdale and Bancredito under which Bloomdale would open an account with Bancredito by transferring the funds to the bank's own account where they would be held for approximately three months, and the funds would be available to Bloomdale upon request within a short period of time. In exchange, Bloomdale would pay Bancredito a four percent (4%) fee based on the value of the funds transferred.

26.     The only documentation that Bancredito requested from Bloomdale was a copy of the passport of the beneficial owner, Jacques Lasry; Bloomdale complied with this request. Bancredito did not require Bloomdale to sign any paperwork or to provide any further documentation. Nor was it informed that any further paperwork or documentation would be required.

27.     In agreeing to these terms, Bloomdale relied upon the knowledge, experience, and expertise of Pristine Capital Group and Bancredito regarding the legal or regulatory requirements of the banking industry in the United States.

28.     On May 26, 2015, Bloomdale wired a total of EUR 7,075,000 in three different wire transfers from its account at the foreign bank into Bancredito own accounts:

    a.     The first wire transfer was for EUR 3,517,500;

    b.     The second wire transfer was for another EUR 3,517,500; and,

    c.     The third wire transfer was for EUR 40,000. See Exhibit 1.

29.     Because Bancredito's accounts held US dollars, and because the rate of exchange from Euros to U.S. dollars on that date was 1.09885, the total amount in US dollars received by Bancredito was $7,774,363.73.

30.     In June of 2015, Furnari informed Bloomdale that, for compliance purposes only, it needed to send certain letters addressed to Bancredito implying that they had executed a Forex Transaction selling Euros against U.S. dollars.

31.     Bloomdale followed Furnari's instructions, relying upon her knowledge, experience, and expertise of the legal or regulatory requirements of the banking industry in the United States. However, it was clearly understood to all the parties involved that the agreement between Bloomdale and Bancredito remained unchanged. See Exhibit 2.

32.     The process of opening an account for Gotra in Dubai took approximately five months.

33.     On November 3, 2015, Bloomdale gave instructions to Bancredito Int'l, through Furnari, to immediately transfer US$3,500,000 to Gotra's bank account in Dubai. See Exhibit 3.

34.     On December 12, 2015, Bancredito disbursed only US$100,000.00 to Gotra's bank account in Dubai. See Exhibit 4.

35.     This transfer did not originate from Bancredito but, rather, an unknown entity unknown to Bloomdale identified as Bancredito Trust.

36.     On December 23, 2015, Bancredito Int'l, apparently using the entity Bancredito Trust as a conduit, transferred US$1,400,000.00 to Gotra's bank account in Dubai. See Exhibit 4.

37.     Bancredito never wired to Gotra the $2,000,000.00 remaining balance of the transfer requested in November 2015.

38.     On January 16, 2016, Bloomdale gave instructions to Bancredito, through Furnari, to immediately transfer another $3,500,000.00 to Gotra's bank account in Dubai. See Exhibit 5. Bancredito failed to comply with such instructions, transferring two months later only $1,000,000.00 of the amount requested by Bloomdale.

39.     In February of 2016, nine months after Bloomdale wired its funds to Bancredito, Herrera Velutini urgently requested that Bloomdale and/or Gotra (the recipient of the funds) sign certain documents which he informed were not meant to be binding but were to be kept in the file to satisfy Bancredito's compliance requirements.

40.     Bloomdale followed Herrera Velutini's instructions, relying upon his knowledge, experience, and expertise of the legal or regulatory requirements of the banking industry in the United States.

41.     It was clearly understood by the parties that the documents that Herrera Velutini was requesting Bloomdale and Gotra to sign did not reflect the terms of their agreement. It was also clearly understood that the original agreement entered into between the parties, in which Bancredito was to charge Bloomdale a four percent (4%) fee for holding the funds for a short period of time, and to make them available immediately upon request, was to still govern the relationship between the parties.

42.     On February 2, 2016, Herrera Velutini required that Gotra (the recipient of the funds) enter into a "Currency Exchange Agreement" before Bancredito would comply with any instructions from Bloomdale to transfer money to Gotra.

43.     The "Currency Exchange Agreement" was incomplete and inaccurate.

        a.      The parties to the Currency Exchange Agreement were Gotra Ltd. and Bancredito Trust (UK), a different entity than the one with which Bloomdale contracted and a different entity than the one which received the transferred funds.

        b.      The amount referenced in the alleged Currency Exchange Agreement, EUR 7,000,000.00, was not equivalent to the amount of money that Bloomdale deposited with Bancredito.

        c.      The document contained a payment schedule which was never agreed to by Bloomdale, with payments to be disbursed commencing on December 10, 2015 and ending on March 7, 2016.

44.     The Currency Exchange Agreement was a non-binding document which did not reflect the parties' agreement. See Exhibit 6. In any event, Defendants did not comply with the payment schedule, and to this day, the amount of $5,227,363.75 of Bloomdale's funds has yet to be returned.

45.     Bancredito also required Bloomdale to provide a detailed description of the corporate structure of Gotra and a copy of its certificate of incorporation, which Bloomdale did.

46.     Upon information and belief, Bancredito did not sign the Currency Exchange Agreement.

47.     The "Currency Exchange Agreement" was not sufficient to satisfy Bancredito's compliance needs.

48.     Thus, in February of 2016, Herrera Velutini required that Gotra enter into a Foreign Currency Forward Master Agreement ("FX Master Agreement") with Bancredito Trust (UK), an

entity which was not a party to the original agreement, and which did not receive the transferred funds.

49.     The FX Forward Master Agreement contained the following Settlement Time Table for the moneys to be disbursed:

> On or before 12.10.15- $100,000.00
> On or before 12.22.2015- $1,400,000.00
> On or before 6.30.2016- $1,865,000.00
> On or before 12.31.2016- $3,215,000

See Exhibit 8.

50.     The FX Master Agreement referenced an exchange rate of $0.94 per EUR 1, which was substantially higher than the exchange rate in place on the date in which it was signed. Under such scenario, Bancredito would disburse to Gotra only $6,580,000.00 out of the $7,774,363.75 that Bloomdale deposited. This means that Bancredito was to retain more than 15% of Bloomdale's funds in exchange for holding the funds for a six-month period. This was never the agreement between Bloomdale and Bancredito. Bloomdale would have never agreed to pay such an exorbitant amount for Bancredito to hold its funds for a six-month period.

51.     Bloomdale and Gotra were informed that the FX Master Agreement was not to be binding in any way and that it was to be signed solely because the compliance department needed some protection and that the original agreement between Bloomdale and Bancredito (not Bancredito Trust (UK)) would still govern the terms of the contractual relationship.

52.     Lasry felt compelled to enter into this other phony "agreement" in order for it to have access to his funds

53.     On February 11, 2016, Furnari sent an email to Bloomdale and to Gotra stating that she had spoken to Herrera Velutini on that same date and that he had confirmed that, as long as

Bancredito had the FX Forward Master Agreement signed for compliance purposes, Bancredito would move forward with a steady and consistent schedule of payments. See Exhibit 7.

54.     She also informed that that Herrera Velutini had confirmed to her that the schedule of payments referenced in the FX Master Agreement (where payments were going to be made between December 10, 2015 and December 31, 2016) was not going to be put into effect, that the payments were going to be made in a much quicker fashion, and that the dates contained in the FX Forward Agreement were merely included in the document to appear to "extend" the payment schedule for compliance purposes. See Exhibit 7.

55.     Gotra was compelled by Herrera Velutini to sign the FX Master Agreement in order to obtain access to Bloomdale's funds. Without the signed FX Master Agreement, the funds would not be released, even though this was not a requirement of the original agreement between Bancredito and Bloomdale.

56.     Gotra signed the agreements with the specific representations made by Herrera Velutini, through Furnari, that the agreements would not be binding and that the terms of the Bloomdale and Bancredito's original agreement would not be changed or affected in any way. See Exhibit 7.

57.      Gotra signed the agreement with the specific understanding that the payment schedule contained in the agreement was not to govern the date of the payments, as the payments were to be made in a quicker fashion. See Exhibit 7.

58.     In addition, Gotra signed the documents relying upon Herrera Velutini and Furnari's knowledge, experience, and expertise of the legal or regulatory requirements of the banking industry in the United States.

59.     Gotra and Herrera Velutini, on behalf of Bancredito Trust (UK), signed the FX Master Agreement on February 11, 2016, nine months after the transfer of the funds into Bancredito, as evidenced by dates printed on the signature page of the document. See Exhibit 8, pp. 8 and 12. Nevertheless, Herrera Velutini, unbeknownst to Gotra and without its authorization, copied the signature and initials of Gotra's representative from the original FX Master Agreement, eliminated the printed date, and pasted them onto another version of a Foreign Currency Forward Master Agreement. See Exhibit 9.

60.     The second, falsified version of the Foreign Currency Forward Master Agreement reflected that it had been entered into on May 25, 2015. This date is nine months prior to February 11, 2016, the date when the original FX Master Agreement was signed and one day prior to the date when Bloomdale transferred the funds to Bancredito. Gotra's representative never signed or authorized the second, falsified version of the Foreign Currency Forward Master Agreement, which is missing the printed date of February 11, 2016. See Exhibit 9.

61.     The Defendants did not comply with neither the Settlement Time Table included in the sham agreement nor the timetable verbally informed to Furnari. To this date, Bancredito still retains $5,227,363.75 of Bloomdale's funds.

62.     On March 7, 2016, Bancredito Trust transferred the amount of $500,000.00 to Gotra's bank account, pursuant to the instructions provided by Bloomdale to Bancredito on January 16, 2016.

63.     On May 20, 2016, Bancredito Trust transferred an additional amount of $500,000.00 to Gotra's bank account, pursuant to the instructions provided by Bloomdale to Bancredito on January 16, 2016.

64.    In July of 2016, Bloomdale and Gotra requested once again the disbursement of Bloomdale's funds. At this time— seven months after Bloomdale's initial request for the transfer of the funds to Gotra— only $2,500,000 out of the $7,774,363.75 had been disbursed. In terms of Euros, this amounts to only EUR 2,278,939 out of the initial deposit of EUR 7,075,000.

65.    In response to Bloomdale's and Gotra's request for the remaining funds, Bancredito stated that, for compliance reasons, the large amounts still due to be disbursed could not be wired, as they were too large, and that each transfer could only be executed for the amount of $500,000.00.

66.    Gotra, through Furnari and at Bancredito's request, issued instructions to Bancredito for the immediate execution of nine weekly transfers of $500,000.00 to take place between June 17, 2016 and August 12, 2016. See Exhibit 10. None of the nine transfers were executed.

67.    During the months of September and October, Bloomdale and Gotra contacted Bancredito in Puerto Rico directly on numerous occasions to request the transfer of the funds. Bancredito provided various excuses as to why it could not transfer the funds.

68.    On numerous occasions, Bloomdale asked Bancredito to establish an account in Bloomdale's own name, so that the funds would no longer be held in Bancredito's accounts and Bancredito would not raise any more "compliance" issues to extend the term for the release of the funds. Bancredito always refused to comply this request.

69.    On XXXXX, Bancredito informed Gotra that it was prepared to transfer the funds but that for "compliance needs", it needed to receive a formal, notarized declaration from the beneficial owner of the accounts that, if Bancredito returned the funds as requested, it would be released from liability.

70.     Bancredito demanded the notarized statement as a condition to releasing the funds.

71.     The notarized statement drafted by Bancredito and confirmed that Bancredito received the Plaintiffs' funds, that it had had returned some of the funds into Gotra's accounts, and that Bancredito would return the remaining funds to Gotra "in the next three weeks'. No other entities are referenced in the notarized statement.

72.     Lasry complied with Bancredito's additional condition for the return of the funds.

73.     On October 26, 2016, Lasry executed the notarized statement requested by Bancredito stating, under oath that

a.      In May of 2015, he made three transfers out of his own funds into Bancredito's account and that part of the original amounts had already been returned to him by Bancredito as payments into two of Gotra's bank accounts.

b.      It had been agreed that the rest of the original amounts deposited would be returned to the Gotra account in the next three weeks in three payments to each of Gotra's two accounts.

c.      Once this has been done and the full amount returned to the Gotra accounts, Bancredito would be free and clear of any liability regarding these transactions.

74.     No other representations were requested by Bancredito and no reference to other entities was made. In addition, Bancredito did not seek a release for any other entity. See Exhibit 11.

75.     The request for a notarized statement releasing Bancredito from liability for releasing funds deposited by a client and belonging to the client is unusual and its only purpose was to delay or further obstruct the return of the funds.

76.     It is clear that Bancredito was aware that it was subject to liability because of its failure to comply with the return of Bloomdale's funds as agreed, and as requested multiple times by Bloomdale. Bancredito was aware that it was unlawfully retaining funds which belonged to Bloomdale.

77.     Despite the fact that Lasry executed the notarized document requested by Bancredito, Bancredito failed to comply with the terms agreed upon and no subsequent transfers were made.

78.     On December 22, 2016, Bancredito informed Furnari that Herrera Velutini had confirmed that a payment would be issued to Gotra in the following week and that, after reconciling the account, regular payments would continue. No payments were ever issued.

79.     During February and March of 2017, Bloomdale and Gotra continued to communicate with Bancredito in order to obtain the release of the remaining funds.

80.     On March 4, 2017, Herrera Velutini, alleged that Bancredito had to reconcile certain bank statements prior to executing the transfers.

81.     On March 6, 2017, Bancredito agreed to execute transfers of $500,000, at a rate of one or two per week commencing on March 14, 2017.

82.     On March 14, 2017, at Bancredito's request, Gotra confirmed its instructions as to the transfer of the payments into Gotra's bank account commencing on March 14, 2017. See Exhibit 12.

83.     On March 27, 2017, almost two weeks after Bancredito was to resume the transfer of the funds, it informed Gotra that its compliance and legal departments were asking it to sign an Addendum "so we can be in order and continue with the payment schedule". See Exhibit 13.

84.    The Addendum purported to change the payment schedule contained in the FX Master Agreement and attempted to stretch the payment schedule into October of 2016. This was contrary to the payment schedule that Bancredito and Gotra had agreed to on March 6th and on March 14, 2017. Therefore, Gotra did not sign the Addendum.

85.    At the end of March 2017, Bancredito agreed, once again, to resume payments into Gotra's bank account. See Exhibits 12 and 14.

86.    Nevertheless, on March 31, 2017, Sofia Saracho, a Director of Bancredito, acting on behalf of Herrera Velutini, contacted Gotra in order to coordinate a meeting to discuss the "pending matter" between Gotra and Bancredito. See Exhibit 15.

87.    Saracho and Gotra's representative met in Paris on April 5, 2017 to discuss the matter of the return of Bloomdale's funds.

   a.    The parties agreed that the FX Master Agreement was neither binding nor applicable.

   b.    The parties were in agreement that a global fee was to apply, as initially agreed to by the parties. Nevertheless, the parties could not agree on the amount of the global fee. Gotra's position was that the applicable fee had been originally agreed at four percent (4%).

   c.    The parties agreed that the payments would resume immediately, even though the final figures had not yet been agreed between them.

88.    Bancredito has continuously changed its position regarding its obligations to Bloomdale, increasing the amount of the fee which the parties had agreed to a global fee of seven percent (7%), stretching the period over which the funds needed to be returned, and restricting the

transfers to payments of one hundred thousand dollars ($100,000.00) at a time. These changes are deceptive and are merely a willful attempt to breach its contractual obligations.

89.     To this day, Bancredito has not transferred the remaining funds to Gotra, as instructed by the rightful owner of the funds, and continues its refusal to do so and in clear breach of its contractual obligations.

## VI.     CAUSES OF ACTION

### A.     Count I- Breach of Contract

90.     Plaintiffs reinstate the allegations set forth in Paragraphs 1 through 78 as if fully set forth herein.

91.     Bloomdale and Bancredito entered into an agreement whereas Bloomdale would deposit certain funds with Bancredito, to be available upon demand after a short period of time, in exchange for payment of a fee of four percent (4%) of the amount of the funds.

92.     Bloomdale deposited the funds with Bancredito, and after a brief period of six months, gave specific instructions to Bancredito to transfer the funds to certain accounts belonging to its sister company, Gotra.

93.     Gotra is a third-party beneficiary of the agreement between Bloomdale and Bancredito.

94.     Bancredito has set forth many invalid excuses and created many artificial obstacles to justify its non-compliance and to hide the fact that it had no intention of returning the funds and fulfilling its contractual obligations.

95.     Upon information and belief, Bancredito and its owner Herrera Velutini have incurred in a pattern and practice of using the funds belonging to the bank's clients for their own purposes and for their own benefit. And when the clients demand the funds, they concoct all sorts

of excuses and set up different imaginary obstacles to defer the release of the funds or to withhold the funds.

96.     Bancredito and its owner Herrera Velutini have a pattern of withholding Bancredito's clients' funds after the clients' demand payment and will only release the funds after the parties threaten or engage in litigation.

97.     Bancredito has failed to return $5,227,363.75 of Bloomdale's funds more than three and a half years after Bloomdale began requesting access to its own funds, in blatant violation of their agreement.

98.     Bloomdale, as a party to the agreement, and Gotra, as third-party beneficiary, have been damaged and continue to be damaged as a result the intentional and willful breach of contract. As a result, Bloomdale and Gotra are entitled to recover pursuant to, among other grounds, under Article 1044 of the Puerto Rico Civil Code, 31 L.P.R.A. §2994; Article 1077, 31 L.P.R.A. §3052; Article 1206, 31 L.P.R.A. §3371; Article 1207, 31 L.P.R.A. §3372; Article 1208, 31 L.P.R.A. §3373, Article 1210, 31 L.P.R.A. §3375 and Article 1054, 31 L.P.R.A.§3018.

99.     Defendants' actions have caused serious damages to Bloomdale and Gotra including, but not limited to, the opportunity cost of the funds and the loss of opportunity to earn interest on the funds.

100.     Bloomdale and Gotra should have had access to the funds since Bloomdale made its initial requests for a transfer of the funds to Gotra. The initial request for a transfer of $3,500,000 occurred on November 3, 2015 and Bancredito only transferred $1,500,000. The second request for a transfer of $3,500,000 occurred on January 16, 2016 and Bancredito only transferred $1,000,000.

101.    Plaintiffs have absolutely no control or access to the funds wrongfully withheld by Bancredito. Bancredito has illegally held on to the amount of $5,227,363.75 for approximately three and a half years after it was obligated to return it to Bloomdale or transfer it to Gotra upon demand.

102.    Defendants must be made liable for any expense, cost, loss or damage sustained by Plaintiffs as a result of their deceptive, wrongful and illegal acts, including the opportunity cost, or the benefit that Plaintiffs missed due to not having access to the funds, which, at a rate of six percent (6%) is calculated to be approximately $1,200.000.00.

103.    Bancredito has reaped the financial benefits of unlawfully retaining the amount of $5,227,363.75 that belongs to Bloomdale for three and a half years. In retaining these funds for its own use and for its own benefit for a period of approximately three and a half years, Bancredito enriched itself and received an economic benefit, which at a rate of six percent (6%) is estimated to be $1,200,000.00. Bancredito is liable to Plaintiffs for these amounts which it obtained illegally and in violation of the agreement. or, in the alternative, these amounts should be deducted from any fee which Bancredito intends to charge Bloomdale for its services.

### B.    Count III-Tortious Interference

104.    Plaintifs reinstate the allegations set forth in Paragraphs 1 through 91 of this Complaint as if fully set forth herein.

105.    Herrera Velutini was aware of Bancredito's contractual obligation with Bloomdale and of the terms agreed to by the parties.

106.    Herrera Velutini intentionally and with knowledge of the existence of the contract between Bancredito and Bloomdale, interfered with the contract by, *inter alia*, requiring Plainitffs

to execute multiple types of sham documentation with an entity which was not part of the original agreement.

107.    Herrera Velutini's actions, as described in this Complaint, were made with the sole purpose of interfering with the agreed upon terms of the contract between Bloomdale and Bancredito.

108.    Plaintiffs suffered extensive damages as a result of Herrera's Velutini's actions. Such damages were foreseeable and a direct consequence of their interference with the contract between Bloomdale and Bancredito.

### C.    Count IV- Attorney's Fees

109.    Plaintiffs reinstate the allegations set forth in Paragraphs 1 through 95 as if fully set forth herein.

110.    Rule 44.1(d) of the Rules of Civil Procedure on recklessness provides the basis for the imposition of attorney's fees in this case. Rule 44.1 states the following: "In the event any party or its lawyer has acted obstinately or frivolously, the court shall, in its judgment, impose on such person the payment of a sum for attorney's fees which the court decides corresponds to such conduct. 32 L.P.R.A. App. V, R. 44.1.

111.    "A party has been obstinate when it engages *in actions that made avoidable litigation necessary*, unnecessarily prolongs litigation, or requires the other party to incur in expenses in the pursuit of avoidable tasks. *Rivera v. LifeLink Found. Inc.*, 255 F. Supp. 3d 327, 331 (D.P.R. 2017).

112.    Bancredito has been obstinate in the handling of this dispute since Bloomdale's funds have not been returned as agreed, and Defendants have made up multiple invalid excuses

and have set up many unreasonable and phony obstacles to excuse the bank's non-compliance. As a result, Plaintiffs were forced to institute this action.

113.     Hence, the imposition of attorney's fees against Defendants is warranted.

WHEREFORE, Plaintiffs respectfully request this Honorable Court to enter judgment against Defendants as requested herein.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 25th day of November of 2019.

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that on this same date we electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all participants and attorneys of record.

**SEPULVADO MALDONADO & COURET**
**Attorneys & Counselors at Law**
**for Bloomdale and Gotra**

304 Ponce de León Ave
Suite 990
San Juan, P.R. 00918
Telephone: (787) 765-5656
Fax: (787) 294-0073


/s/ Lee R. Sepulvado-Ramos
LEE R. SEPULVADO RAMOS
USDC-PR No. 211912
lee_sepulvado@scmlawpr.com

/s/ Lady E. Cumpiano
LADY E. CUMPIANO
USDC-PR No. 211106
lcumpiano@scmlawpr.com